**November 3, 2017**

# In the Court of Appeals of Georgia

A17A0624. LEE v. MERCURY INSURANCE COMPANY OF  SE-026
    GEORGIA et al.

SELF, Judge.

Ronald Lee appeals from the trial court's order granting Mercury Insurance

Company of Georgia's ("Mercury") motion for summary judgment and denying his

cross-motion for summary judgment on the issue of insurance coverage following a

house fire. Lee contends that the trial court erred by concluding that the policy did not

provide coverage as a matter of law, asserting that the trial court should have instead

concluded that he was entitled to summary judgment in his favor for breach of the

insurance contract and the right to recover bad faith damages under OCGA § 33-4-6.[1]

He also asserts that genuine issues of material fact exist regarding Mercury's claim

---

[1] Lee asserts in the alternative that issues of fact exist with regard to his right
to recover bad faith damages.

that it is entitled to void the policy based upon alleged misrepresentations in his application for insurance. Finally, he argues that the trial court erred in denying his motion to strike the affidavit of Mercury's director of underwriting, as well as denying his motion to compel production of Mercury's claim file.

For the reasons explained below, we reverse the trial court's grant of summary judgment in favor of Mercury with regard to all issues other than bad faith, grant Lee's motion for summary judgment on the issue of coverage under the policy, and affirm the trial court's denial of Lee's motion to strike and motion to compel. Based upon our conclusion that genuine issues of material fact exist with regard to whether Mercury is entitled to void the policy, Lee cannot yet obtain a recovery under the policy.

"On appeal, we review the grant or denial of summary judgment de novo, construing the evidence and all inferences in a light most favorable to the nonmoving party." (Citation and punctuation omitted.) *Seki v. Groupon, Inc.*, 333 Ga. App. 319 (775 SE2d 776) (2015). So viewed, the record shows that Lee lived with his wife in South Carolina, but traveled frequently as a senior project manager for a company constructing public housing developments. He typically traveled during the week and

2

was home in South Carolina on the weekends. He explained that most projects would take 10-12 months to complete.

In 2007, Lee frequently traveled between two projects: one in Winder, Georgia, and the other in Crestview, Florida. During this time, Lee's childhood friend, Jim Constable, faced significant financial difficulties because he was caring for his wife, who suffered from a long-term terminal illness, and unable to work. To help his friend, Lee agreed to purchase Constable's home at 7066 Dalmatia Drive in Riverdale, Georgia, pay the mortgage payments, and allow Constable's family to continue living there for free. This arrangement "gave [Lee] a place to stop, plus it helps [Constable] and his family, and [Lee didn't] have to rent motel rooms." Lee explained that he "was traveling constantly, flying through Atlanta. And I'd just stop in there . . . and then go catch another flight the next day."

In December 2007, Lee purchased the Riverdale house from Constable, and Constable's family continued living on the property. It is undisputed that Constable paid no rent. As part of their arrangement, Constable gave Lee all of the furniture in the bedroom, living room, kitchen, and dining room. Lee wanted the option to rent the house in the event Constable's money problems deteriorated to the point where he had to move out and live with other family members. When Lee first took out the

3

loan in 2007, he stayed at the Riverdale house so many nights each week, his mortgage company considered it his primary residence. Later, he stayed there "maybe one night a week, every other week, or something."

In 2010, Lee made a claim with a different insurance carrier for hail damage to the Riverdale house. After telling Constable that this carrier planned to increase his premiums as a result of the claim, Constable stated that his friend, Lawrence Arnold, was an insurance agent who could obtain insurance for the house. In his deposition, Lee explained that he talked with Arnold over the telephone to provide him with the information required to complete the application. Because he was not there to sign the application, Lee asked if Constable could sign his name, and Arnold replied, "yes, that's fine." According to Lee, Arnold knew that he would not be living there full-time; Lee told him that he would "be stopping in . . . because I travel." Lee also testified that Arnold never asked him if he would be living there, because Arnold "knew [Constable] was living there" based upon Arnold's friendship with Constable.

All of the answers in Lee's application for insurance were typed, consistent with Lee's testimony that he did not personally complete the application. In one section of the application, the directions state, "Check all that apply," and an "X" is typed in the boxes beside "Primary" and "Occupied by Named Insured"; the boxes

4

beside "Secondary" and "Additional Residence for Insured" are left blank. This section does not include a box identifying the property as rental property. Another section of the policy directs that all residents of the household be listed, including unrelated individuals. Lee's name, followed by the abbreviation "IN," along with his friend, Jim Constable, and Constable's two children, followed by the abbreviation "OR," meaning "other" are typed into a column titled "Rel. to Ins."

On May 5, 2012, the property was destroyed by an accidental fire in which Constable died and one of his daughters suffered serious injuries. After receiving a letter denying his claim for coverage under the policy in December 2012, Lee filed a complaint against Mercury and Arnold alleging various theories of recovery. He later dismissed his claim against Arnold with prejudice.

During discovery, Lee filed a motion to compel Mercury to produce documents in its claim file. Mercury responded that it had already produced many of the requested documents, as well as a privilege log detailing its attorney-client privilege and work product objections to Lee's remaining requests. The trial court held a hearing, inspected the documents in camera, and then granted Lee's motion in part, but denied it as to documents it determined were protected by attorney-client privilege and the work product doctrine.

Following the completion of discovery, Mercury filed a motion for summary judgment in its favor based upon (1) the misrepresentation in the policy application that the Riverdale house was Lee's primary residence and (2) Lee's failure to reside at the Riverdale house as required by the terms of the policy. Lee filed a response, a cross motion for summary judgment, and a motion to strike the affidavit of Mercury's director of underwriting, which Mercury filed in support of its motion for summary judgment. Lee asserted that he was entitled to summary judgment in his favor on the issue of coverage under the terms of the policy and Mercury's bad faith. Following a hearing, the trial court granted Mercury's motion for summary judgment and denied both Lee's cross-motion for summary judgment and his motion to strike.

1. *Coverage Under the Policy*. Lee asserts that the trial court should have granted summary judgment in his favor "as there is sufficient evidence in the record to support a finding of breach of contract."[2] In his view, the policy provisions

---

[2] We disagree with the dissent's assertion that the issue of coverage has been abandoned by the insured in this case pursuant to Court of Appeals Rule 25 (c) (2). We have "recognized that abandonment under Rule 2[5] (c) (2) applies only where the party has made no meaningful argument, e.g., referenced only the language in the enumeration, or demonstrated by a lack of interest that the enumeration possesses no merit." (Citations and punctuation omitted.) *American Central Ins. Co. v. Lee*, 273 Ga. 880, 883 (2) (548 SE2d 338) (2001). Here, the entire case revolves around whether Lee is entitled to insurance proceeds as a result of the fire, and it cannot fairly be said that his brief made no meaningful argument or demonstrated a lack of

expressly cover the loss of the Riverdale house due to fire, and this home qualified for coverage under the policy terms. We agree.

Under Georgia law,

[i]t is well settled that insurance policies, even when ambiguous, are to be construed by the court, and no jury question is presented unless an ambiguity remains after application of the applicable rules of contract construction. Because insurance policies are contracts of adhesion, drawn by the legal draftsman of the insurer, they are to be construed as reasonably understood by an insured.

(Citation and punctuation omitted.) *First Financial Ins. Co. v. American Sandblasting Co.*, 223 Ga. App. 232 (1) (477 SE2d 390) (1996). "The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." *Cincinnati Ins. Co. v. Davis*, 153 Ga. App. 291, 295 (265 SE2d 102) (1980). "The insurer, in preparing the language of its policy, has the burden of using

interest on the issue of coverage under the policy. Moreover, even if we could somehow deem the argument abandoned under Rule 25 (c) (2), we are not obligated to and should not do so in this case. See *Woods v. Hall*, 315 Ga. App. 93, 96 (726 SE2d 596) (2012) (exercising discretion to review enumerations of error on the merits even though none of the enumerated errors relating to trial court's grant of summary judgment were "supported by citations to the record or argument"). See also *Janet Ricker Builder v. Gardner*, 244 Ga. App. 753, 754 (536 SE2d 777) (2000) (exercising discretion to consider main arguments presented on appeal to overturn trial court's grant of summary judgment).

language that is clear and precise." *Ga. Farm Bureau Mut. Ins. Co. v. Meyers*, 249 Ga. App. 322, 324 (548 SE2d 67) (2001). "The test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." (Citation and punctuation omitted.) *United States Fire Ins. Co. v. Capital Fort Truck Sales*, 257 Ga. 77, 78 (1) (355 SE2d 428) (1987).

"[I]f a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied." (Citation and punctuation omitted.) *American Strategic Ins. Corp. v. Helm*, 327 Ga. App. 482, 485 (759 SE2d 563) (2014). When a provision of an insurance contract is ambiguous, a well-known rule of construction is that it will be "construed against the party preparing it and in favor of coverage." (Citation and punctuation omitted.) *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Assn.*, 288 Ga. App. 355, 357 (654 SE2d 207) (2007). "Ambiguity in an insurance policy may [also] be defined as duplicity, indistinctness, an uncertainty of meaning or expression." (Citation and punctuation omitted.) *Alley v. Great American Ins. Co.*, 160 Ga. App. 597, 599 (287 SE2d 613) (1981).

The "COVERAGE A - DWELLING"[3] portion of Lee's policy with Mercury states:

We cover:

the dwelling on the **residence premises** shown in the Declarations used principally as a private residence, including structures attached to the dwelling; materials and supplies located on the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**. . . . (Emphasis in original.)

The policy defines "residence premises" as follows:

"**Residence premises**" means the one, two, three or four family dwelling, condominium or rental unit, other than structures and grounds, used principally as a private residence; where you reside and which is shown in the Declarations. (Emphasis in original.)

The policy does not define the term "reside." And nowhere in the policy is there a reference to a "primary residence" or "secondary residence," much less a definition of these terms.[4] And unlike other insurance policies, it did not include an express

---

[3] While the policy provides a definition for "[i]nsured location," this definition is not implicated in determining coverage for loss of the dwelling due to a fire. Instead, it comes into play in the portion of the policy providing "Coverage F - Medical Payments To Others."

[4] While the application instructed the insured to "check all that apply" and listed "primary" and "occupied by Named Insured," as options to select, the policy did not incorporate the application by reference and the application does not state that it would become part of the policy. Nor does the record show that the application was made a part of or attached to the policy; it appears as a separate exhibit to the

9

condition requiring the insured to reside only at the residence premises. Compare *Ga. Farm Bureau Mut. Ins. Co. v. Kephart*, 211 Ga. App. 423, 424 (1) (a) (439 SE2d 682) (1993) (physical precedent only).

Based upon the placement of the semicolon in the definition of "residence premises," a layperson could reasonably understand the defined term to mean "the one, two, three or four family dwelling condominium or rental unit, other than structures and grounds, used principally as a private residence" *or* "where you reside

---

complaint and in depositions. Additionally, the only reference in the policy to the application states only that Lee "agree[d] that the policy has been issued in reliance upon the statements in the Declarations and the application." Accordingly, the application should be considered to determine whether Mercury is entitled to void the policy based upon any misrepresentations contained in the policy as discussed, infra. The cases relied upon by the dissent are distinguishable. In *West v. Rudd*, 242 Ga. 393 (249 SE2d 76) (1978), the application stated "all answers to such questions, together with this agreement shall form the basis and become a part of any policy issued thereon." (Punctuation and emphasis omitted.) Id. In *Canal Indem. Co. v. E.M.C. Motors*, 227 Ga. App. 84, 85 (1) (488 SE2d 126) (1997), we noted the general rule that insurance contracts are construed according to terms in the policy and as modified by any "application made a part of the policy." (Citation omitted.). But in that case, the particular notice to the insured was attached to the policy. Even so, we nonetheless declined to consider language in the notice even though it was attached to the policy, because the notice expressly stated that it did not amend the policy. In this case, there is no evidence that the application was attached to the policy, and the policy language makes it relevant only to the issue of misrepresentation.

10

and which is shown in the Declarations."[5] "Punctuation is an important indicator of meaning." *Hill v. Nationwide Mut. Fire Ins. Co.*, 214 Ga. App. 715, 717 (448 SE2d 747) (1994). "The semicolon is normally employed in marking off a series of sentences or clauses of coordinate value, that is, to separate consecutive phrases or clauses which are independent of each other grammatically, but dependent alike on some word preceding or following." (Citation omitted.) *Springtime, Inc. v. Douglas County*, 228 Ga. 753, 755 (1) (187 SE2d 874) (1972). In this case, the definition of "residence premises" could be read by a layperson as having two separate, consecutive clauses (definitions) dependent alike upon the preceding word "means."

In *Georgia Intl. Life Ins. Co. v. Bear's Den*, 162 Ga. App. 833, 835 (1) (292 SE2d 502) (1982), we addressed ambiguity in an insurance policy caused by the lack of an "and" or an "or" after a comma in policy language defining when the policy became effective. In that case, the insurer asserted that the connective "and" should be inserted after a comma to create three conditions for the policy to become

---

[5] We disagree with the dissent's view that this interpretation would allow coverage "*without* any requirement that such dwelling be 'shown in the Declarations.'" (Emphasis in original.) The separate statement of coverage in the policy, which includes the reference to "residence premises," requires that the dwelling "be shown in the Declarations." Accordingly, the insurance company had no need to state this again in the definition of "residence premises," and the "tortured reading" posed by the dissent is an impossibility.

11

effective, while the insured asserted that the comma separating the first two conditions from the third should be construed as the disjunctive "or." Id. at 834. We held:

> Because neither an "and" nor an "or" appears in the provision in question in the instant case, it is not possible to determine from the provision itself whether the conditions to enforceability stated therein are disjunctive or conjunctive. Either construction would be viable. Thus, the provision in the instant case, containing neither a conjunctive nor a disjunctive connective, is inherently ambiguous.[6]

(Citation omitted.) Id. at 835. We are persuaded by this reasoning to reach the same conclusion in this case.[7]

---

[6] While the dissent implies that *Bear's Den* stands for the proposition that we should read in the disjunctive when there is neither a conjunctive or disjunctive term after a comma, we did so in that case because we were required to construe the ambiguity in favor of the insured. Here, the ambiguity requires a conjunctive reading.

[7] Although research has revealed no other Georgia decisions addressing identical policy language, in *Hill*, supra, we concluded that the policy provided alternative definitions of "residence premises" based upon the use of a semicolon followed by the word "or." 214 Ga. App. at 717. Compare *Varsalona v. Auto-Owners Ins. Co.*, 281 Ga. App. 644 (637 SE2d 64) (2006) ("policy . . . defines 'residence premises' to mean 'the one or two family dwelling where *you reside*, including the building, the grounds and other structures on the grounds *or* that part of any other building where *you reside*, including grounds and structures which is described in the Declarations") (punctuation omitted; emphasis supplied); *Kephart*, supra, 211 Ga. App. at 424 (1) (a) (policy contained special provision stating "residence premises must be the only premises where the named insured or spouse maintains a residence

12

The dissent states that "the plain language" of the policy "provides that it covers the residence premises and defines such as a private residence where the insured resides." In order to reach this result, however, the dissent must rewrite the policy by removing the semicolon. This we cannot do. "It is the duty of the courts to construe and enforce contracts as made, and not to make them for the parties. The law will not make a contract for the parties which is different from the contract which was executed by them." (Citations and punctuation omitted.) *Perkins Hardwood Lumber Co. v. Bituminous Cas. Corp.*, 190 Ga. App. 231, 232 (1) (378 SE2d 407) (1989). See also *Moore v. Continental Cas. Co.*, 746 A2d 1252, 1256 (Conn. 2000) ("We cannot rewrite the insurance policy by adding semicolons any more than we can by adding words.").

The dissent's proposed construction of the policy also conflicts with Mercury's internal practices. Kevin Bailey, the director of underwriting for Mercury Insurance Group, testified that Mercury "use[s] the same policy contract for primary or secondary dwelling[s]." But the dissent would require an insured to reside, meaning

other than business or farm properties") (punctuation omitted); *Epps v. Nicholson*, 187 Ga. App. 246 (370 SE2d 13) (1988) ("policy defines 'residence premises' as 'the one or two family dwelling, other structures, and grounds or that part of any other building where you reside and which is shown as the 'residence premises' in the Declarations").

13

"dwell permanently or for some considerable time . . . in or at a particular place," in order to obtain coverage under the policy. Under this interpretation, a secondary residence, such as a beach or mountain home, would be not be covered under the policy form, even though it is undisputed that Mercury used the same policy form to insure secondary residences. *Lemieux v. Blue Cross & Blue Shield of Ga.*, 216 Ga. App. 230, 231 (453 SE2d 749) (1994) ("where the contract is ambiguous or open to interpretation, 'all the attendant and surrounding circumstances' must be considered to discover the parties' intention").[8] Reading the definition of "residence premises" to provide an alternative definition as outlined above would provide coverage for secondary residences, consistent with the underwriter's testimony, and prevent future litigation over illusory and worthless policies issued by Mercury for secondary residences. See *Isdoll v. Scottsdale Ins. Co.*, 219 Ga. App. 516, 518 (1) (466 SE2d 48) (1995) (rejecting construction of policy that would make coverage afforded by policy illusory). We should avoid a construction that would "hoodwink" insurance purchasers and make a nullity of coverage. *United State Fire Ins. Co. v. Hilde*, 172

---

[8] The dissent's reliance upon the parol evidence rule to dismiss this evidence is misplaced, because parol evidence is admissible to explain ambiguities in an insurance contract. See, e.g., *Allstate Property & Cas. Ins. Co. v. Musgrove*, No. A17A1655, 2017 Ga. App. LEXIS 391 at * 4 (August 24, 2017).

Ga. App. 161, 163 (2) (322 SE2d 285) (1984). If Mercury had intended for this policy form to cover only primary residences of an insured, it could have easily done so by using the word "your" in place of "a" in its statement of coverage." The policy would have then read: "We cover the dwelling on the **residence premises** shown in the Declarations used principally as [your] private residence. . . ." Mercury's failure to do so is consistent with Mercury's use of this policy form, as testified to by its own director of underwriting, to insure both primary and secondary residences.

To support the claim that we should read the semicolon out of the policy, the dissent cites cases relying upon an anachronistic view of punctuation that are also factually distinguishable. See *Ewing's Lessee v. Burnet*, 36 U. S. 41, 54 (11 Pet. 41, 9 LE2d 624) (1837); *Bridges v. Home Guano Co.*, 33 Ga. App. 305, 311 (125 SE 872) (1924). In *Bridges*, a case not involving the construction of an insurance policy, we cited the Century Dictionary[9] as "tell[ing] us, what is common knowledge, that there is still much uncertainty and arbitrariness in punctuation.'" Id. at 311. We also cited law dating back to 1837.[10] In their treatise on the proper interpretation of legal texts,

_____

[9] This dictionary of American English was first published in 1889, and it went out of print in 1911. https://www.britannica.com/topic/Century-Dictionary-and-Cyclopedia.

[10] See *Ewing's Lessee*, supra, relied upon by the dissent.

15

Justice Scalia and Professor Garner explain why this historic bias against punctuation

exists and should no longer be continued in modern times:

> No helpful aid to interpretation has historically received such dismissive treatment from the courts as punctuation—periods, semicolons, commas, parentheses, apostrophes. The original reason was understandable enough. Punctuation was considered of small account because it was thought to be "the work of the engrossing clerk or the printer." And again, in the days of yore, it was held that because many legislators voted only on the basis of bills that they heard read aloud—without seeing the printed page—they could take no notice of the punctuation marks. . . .[11]

> Commentators have often said that "punctuation is never permitted to control, vary, or modify the plain and clear meaning of the language of the body of the act." This must be a remnant of the former denigration of punctuation that had not been adopted by the legislature; in modern times, we see no rational basis for such a rule. As is the case with other indicators of meaning, the body of a legal instrument cannot be found to have a "clear meaning" without taking account of its punctuation. There is no reason to exclude punctuation from this stage of the inquiry. And we disagree with the position that the use of punctuation as an interpretive aid should be relied on only "when all other means fail."

> Punctuation is often integral to the sense of written language.

---

[11] As with bills of legislation read aloud, the United States Supreme Court's decision in *Ewing,* supra, addressed punctuation in a jury charge, which is also read aloud. Scalia and Garner cite this decision in their book and expressly disagree with its statement that punctuation "should be relied on only 'when all other means fail.'" (Footnote omitted.) Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 161-162 (1st ed. 2012).

(Punctuation and footnotes omitted.) Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 161-162 (1st ed. 2012). For example, "[p]eriods and semicolons insulate words from grammatical implications that would otherwise be created by the words that precede or follow them. . . ." Id. at 162. See also *In re Hawker Beechcraft*, 515 B.R. 416, 424 (S. D. N.Y. 2014) ("Punctuation in a legal text will rarely change the meaning of a word, but it will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part.") (citation and punctuation omitted). Since the publication of this treatise, other courts have cited its view of punctuation favorably. See *Navajo Nation v. United States Dept. of the Interior*, 819 F3d 1084, 1093 (9th Cir. 2016) ("Punctuation is a permissible indicator of meaning.") (citation and punctuation omitted); *Maple Drive Farms v. Vilsack*, 781 F3d 837, 847 (II) (A) (6th Cir. 2015) ("No intelligent construction of a text can ignore its punctuation.") (Citation and punctuation omitted); *In re Hawker Beechcraft*, supra.

Moreover, the *Bridges* case does not require a different result here. Instead, it should be viewed as appropriately applying the exception to the maxim that the rules of grammatical construction usually govern unless they are contrary to the intent of

17

the parties. See OCGA § 13-2-2 (6).[12] In that case, the contract provision at issue stated: "'In case of destruction of our mills, in whole or in part, or stoppage by strikes or other causes, we reserve the right to cancel all or any part of this contract; and the company reserves the right to ship all or part of this contract as they may deem expedient.'" 33 Ga. App. at 305. The defendant drafted the clause and contended that the clause after the semicolon should "be considered independently of the preceding part of the sentence, and thus as attaching an unconditional reservation of the right to ship only such part of the fertilizers as it might deem expedient." Id. at 308. After examining other provisions in the contract, we concluded that the defendant's interpretation of the contract would render other provisions in the contract "wholly superfluous" and read "the right to ship all or part" of the order as dependent upon the previously stated conditions. Id. at 310-311.

---

[12] This Code section provides: "The rules of grammatical construction *usually* govern, but to effectuate the intention they may be disregarded. . . ." (Emphasis supplied.) It is a tool to be used to correct "grammatical errors and omitted terms," *Altamaha Riverkeeper v. Rayonier, Inc.*, Case No. CV214-44, 2015 U. S. Dist. LEXIS 42849 at * 19-20, (S. D. Ga. 2015), if "necessary to effectuate the intention of the parties to the contract." *Ardis v. Printup*, 39 Ga. 648, 652 (2) (1869). In this case, such a correction would appear to be contrary to the intent of the insurer as demonstrated by the underwriter's testimony that the same policy would have been issued for a secondary residence. Accordingly, we conclude that the rules of grammatical construction govern.

We expressly recognized, however, that

> [i]t might be possible for a case to arise in which all other considerations were evenly balanced and that the difference between these marks of punctuation might, like a feather's weight, turn the scale to one side rather than the other; but this is not a case of that character. The punctuation of an instrument may be considered when the meaning is doubtful, but it can not control if the meaning otherwise plainly appears.

(Citations and punctuation omitted.) Id. As this is not a case in which an intent contrary to the punctuation used by the insurance company in drafting the policy plainly appears, we cannot ignore the semicolon.

In sum, it has long been settled that even

> if, notwithstanding the arrangement of the clauses in the sentence and the punctuation of the same, the words, [at issue], could be construed as applying to and modifying the other clauses in the sentence, such a construction could not be adopted, for it would be construing an ambiguous stipulation in an insurance contract most favorably for the insurer and most unfavorably against the insured, which is exactly the reverse of the law.

*Massachusetts Mut. Life Ins. Co. v. Boswell*, 20 Ga. App. 446, 451 (93 SE 95) (1917). Accordingly, we reverse the trial court's grant of summary judgment in favor of

Mercury, as well as its denial of Lee's motion for summary judgment in his favor, on the issue of coverage under the policy.

2. *Misrepresentations in the Application*. Lee asserts that the trial court also erred by granting summary judgment to Mercury based upon its conclusion that a misrepresentation in the policy application voided the policy. We agree.

OCGA § 33-24-7 provides:

(a) All statements and descriptions in any application for an insurance policy or annuity contract or in negotiations for such, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties.

(b) Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:

 (1) Fraudulent;

 (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

 (3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

20

In this case, the trial court relied upon subsections (b) (2) and (3) to prevent Lee's recovery under the policy.

(a) *Effect of Uncontradicted Affidavit.* Before addressing the particular facts of this case with regard to the alleged misrepresentation, our law in this area needs to be clarified; otherwise, "magic words" in the affidavit of an insurance company's employee or agent will be allowed to eviscerate the statutory requirement of "good faith" in subsection (b) (3).

There are several older panel decisions by this Court which hold that an "uncontradicted affidavit" from an underwriter or agent for the insurer averring that the policy would not have been issued had the true facts been known *precludes* any genuine issue of material fact with respect to whether the insurer in good faith would not have issued the policy. *Burkholder v. Ford Life Ins. Co.*, 207 Ga. App. 908, 908-909 (1) (429 SE2d 344) (1993) ; *Graphic Arts Mut. Ins. Co. v. Pritchett*, 220 Ga. App. 430, 432-433 (2) (469 SE2d 199) (1995) . In a later whole court decision, this Court clarified the law in this area, but neglected to overrule these decisions. *Case v. RGA Ins. Svcs.*, 239 Ga. App. 1, 2-3 (1) (521 SE2d 32) (1999).

In *Case*, supra, the only evidence in support of the insurer's misrepresentation claim was an affidavit from the director of underwriting stating that the insurance

company would not have issued the policy if it had known a member of the insured's household had a negative driving history. We applied a long-standing rule "that summary judgment can never issue based upon opinion testimony alone," and reversed the trial court's grant of summary judgment in favor of the insurer. (Citation and punctuation omitted.) 239 Ga. App. at 2-3 (1). The rationale for this rule is that "opinion testimony is always a question of acceptance or nonacceptance on the part of the jury." (Citation and punctuation omitted.) Id. at 2 (1). We explained that we could not "adopt a holding which provides that summary judgment must go to the insurer if the insurer's employee provides his employer with a favorable opinion in the requisite affidavit. The test for materiality of a representation in an insurance application should not be based upon such procedural gaming. . . ." Id. at 2 (1) While the opinion testimony rule has subsequently been limited to cases in which expert testimony is not required,[13] our holding in *Case* still applies to the affidavit of an underwriter opining that his employer would not have issued a particular policy if additional facts had been disclosed.

_____

[13] See *Savannah Valley Production Credit Assn. v. Cheek*, 248 Ga. 745, 746-747 (285 SE2d 689) (1982) (opinion testimony may not be used to support judgment unless contention of fact is capable of proof only by expert testimony, such as medical or legal malpractice actions).

Our holding in *Case* also comports with the plain language of the statute, which places the burden on the insurance company to demonstrate that it "*in good faith* would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for. . . ." (Emphasis supplied.) OCGA § 33-24-7 (b) (3). See also *Thompson v. Permanent Gen. Assur. Corp.*, 238 Ga. App. 450, 451 (519 SE2d 249) (1999) (burden of proof on insurer to demonstrate that misrepresentation was material before rescinding policy). In other contexts, the Supreme Court of Georgia has held that "[t]he question of the insurer's good faith (or lack thereof) is one of fact for the jury. . . ." *Binns v. MARTA*, 250 Ga. 847, 848 (301 SE2d 877) (1983). "Good faith is always a question for the jury. *Even though the party may swear he acted in good faith*, the jury may decide he acted in bad faith from consideration of facts and circumstances in the case." (Citations and punctuation omitted; emphasis supplied.) *Builders Transport v. Hall*, 183 Ga. App. 812, 816 (2) (360 SE2d 60) (1987).

Our holdings in *Graphic Arts*, supra, and *Burkholder*, supra, however, allow an insurer to automatically establish good faith though an employee's affidavit stating hypothetically, and after a loss has occurred, that the company would not have issued the policy if the true facts had been known. In most cases, it will be difficult for the

23

insured to "contradict" a statement that is subjective and by its very nature opinion testimony. In keeping with our holding in *Case*, supra, the plain language of the statute, and our law concerning good faith generally, we overrule the above-referenced holdings in *Graphic Arts* and *Burkholder*. To the extent our opinion in *T. J. Blake Trucking v. Alea London, Ltd.*, 284 Ga. App. 384 (643 SE2d 762) (2007) , also stands for the proposition that an uncontroverted affidavit from an insurance company's underwriter precludes a finding of a genuine issue of material fact on the issue of good faith, it is disapproved.

(b) *Materiality*. The test for materiality under OCGA § 33-24-7 (b) (2) is an *objective* determination. "A material misrepresentation is one that would influence a *prudent insurer* in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." (Citations and punctuation omitted; emphasis in original) *Lively v. Southern Heritage Ins. Co.*, 256 Ga. App. 195, 196 (1) (568 SE2d 98) (2002). This is an objective standard for materiality. Id. See also *Woods v. Independent Fire Ins. Co.*, 749 F2d 1493, 1497 (11th Cir. 1985). Accordingly, just as with good faith, an affidavit from an insurer stating that certain information omitted from an application was material does not automatically entitle an insurer to void a policy. Additionally, the complete test for

24

materiality must be considered. "In order to void a policy of insurance for a misrepresentation in the application [under OCGA § 33-24-7 (b)(2)], the insurer must show that the representation was false and that it was material *in that it changed the nature, extent, or character of the risk*." (Citation and punctuation omitted; emphasis supplied.) *Bear's Den,* supra, 162 Ga. App. at 838 (3).

Finally, questions of good faith and materiality under OCGA § 33-24-7 (b) are "mixed question[s] of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question." (Citation and punctuation omitted.) *Woods*, supra, 749 F2d at 1497. A court may decide the issue as a matter of law "where the evidence excludes every reasonable inference except that it is material" or that the insurer has asserted its hypothetical decision in good faith. *Ga. Farm Bureau Mut. Ins. Co. v. Richardson*, 217 Ga. App. 201, 204 (1) (457 SE2d 181) (1995). In some cases, the nature of the particular misrepresentation, the coverage afforded by the policy, underwriting guidelines, and/or the negotiations between the parties,[14] in addition to an affidavit from a company underwriter, will allow a court to determine

---

[14] This list of possible evidence is not intended to be exhaustive; it is provided for purposes of illustration.

good faith and materiality as a matter of law. See, e. g., *Pope v. Mercury Indem. Co.*, 297 Ga. App. 535, 538-539 (1) (677 SE2d 693) (2009).

(c) *Issues of Fact in this Case.* With a proper understanding of the law to apply in this context, we now turn to the particular facts of this case. In its order granting summary judgment, the trial court relied upon an affidavit from Mercury's director of underwriting averring:

> Defendant would not in good faith have issued the homeowners insurance policy at issue nor would it have issued the policy for the premium rate charged for the insurance policy at issue in this case in 2010, had it known of the material misrepresentations that were made in the aforesaid application, including the misrepresentations that the residence at issue was the Plaintiff's primary residence and occupied by the Plaintiff.

The underwriter provided no explanation in the affidavit or his deposition testimony about how the misrepresentations changed the nature, extent, or character of the risk. And as outlined above, this opinion testimony does not automatically entitle Mercury to summary judgment in its favor on the issue of good faith. Instead, we must look at all of the evidence in the case to determine whether it excludes every reasonable inference except that the misrepresentations were material or that the insurance company asserted its hypothetical decision in good faith.

26

With regard to materiality, Lee submitted the affidavit of an expert witness who opined that "[i]f a residence is occupied, whether the residence is primary or secondary is not material to the issuance of a policy for homeowner insurance and will not preclude coverage. Instead, many factors are considered such as whether the residence is vacant or rented." It is undisputed that Constable paid no rent and that the home was occupied. Other evidence in the record shows that Mercury would issue the same policy for a secondary home if it met the same physical requirements as a primary home as defined in the Mercury Insurance Company Georgia Homeowner Manual. The "Agent's Manual Georgia Homeowner" also stated that secondary dwellings were required to meet the physical requirements of a primary dwelling. Mercury's underwriter testified that physical requirements relate to items like the age of the house and the heating, electrical, and plumbing systems of the home. He confirmed that a survey of Lee's home showed that the age of the home, its condition, its roof, its distance from fire protection services, slope, natural hazards, security, along with numerous other factors, fulfilled the physical requirements of a primary dwelling. The only portion of the home not meeting Mercury's physical requirements was the presence of a diving board, which was removed from the home at Mercury's request. After the removal of the diving board, the home fulfilled all the physical

27

requirements of a primary dwelling. Finally, the Agent's Manual states: "The base rate for a secondary location is calculated . . . by rating the dwelling as though it were a primary location, then applying a 5% credit to the base premium."

This evidence creates genuine issues of material fact as to whether Mercury has asserted in good faith that it would not have issued the policy in the first instance and whether it would have charged a higher rate if it had known the true facts. See *Lively*, supra, 256 Ga. App. at 196 (1) (finding issues of fact where underwriter failed to set forth "any bright-line company policies" in affidavit containing only "blanket statements that she would not have issued the policy if she had known of the [insured]s' prior history" and insured submitted expert affidavit averring that the prior history would not automatically preclude coverage). It also creates genuine issues of material fact with regard to whether the misrepresentation was "one that would influence a *prudent insurer* in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." (Emphasis in original.) Id. Mercury has presented no evidence showing how the misrepresentation changed the nature, extent, or character of its risk. We therefore reverse the trial court's grant of summary judgment to Mercury on the issue of misrepresentation.

28

(d) *Dual Agency*. Lee asserts, in the alternative, that even if the misrepresentation were material, issues of fact exist with regard to whether Arnold was a dual agent. In support of this assertion, he cites well-established law that an insurance company is estopped from voiding a policy based upon misrepresentations in the application "if actual knowledge of the true state of facts is legally imputable to it." *Reserve Life Ins. Co. v. Bearden*, 96 Ga. App. 549, 550 (1) (101 SE2d 120) (1957). "An insurer cannot justly assert reliance upon a representation it knows to be false, or is properly charged with knowing to be false." *Peek v. Southern Guar. Ins. Co.*, 240 Ga. 498, 500 (2) (241 SE2d 210) (1978). Accordingly, if Arnold acted as an agent for both Mercury and Lee, his alleged knowledge about the home being a secondary residence can be imputed to Mercury. In Georgia, an agency relationship is created "wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1.

In this case, issues of genuine material fact exist as to whether Arnold may have been an express agent of Mercury, in addition to acting as Lee's agent to procure the policy. Evidence supporting this conclusion includes: Arnold had authority to bind an insurance policy with Mercury after he entered a client's information into a form application on Mercury software on his computer system and he did so for Lee

29

in this case; Arnold always submitted applications to Mercury "bound"; the director of underwriting for Mercury confirmed that when it receives applications from an agent, "it is typically already bound for coverage in accordance with the rules in our manual"; the "Binder" section of Lee's application stated: "Provided this binder is signed by the Representative, insurance is bound 30 days from the effective date shown, unless cancelled sooner by notice or a policy is issued"; Arnold signed the binder as the "representative" of Mercury; Arnold testified that he sent an "Evidence of Property Insurance" form to Lee which stated "Mercury Insurance Company of Georgia" at the top and "Authorized Representative" underneath his signature; and Arnold was also authorized to accept payments for policies.[15]

The evidence cited by Mercury to support its sparse argument[16] that Arnold was not a dual agent as a matter of law is limited to two facts. First, Arnold agreed in his deposition that he was an independent agent because "[t]hat's what our name is. We

---

[15] Arnold did not accept payments from Lee, because Lee's lender paid the premiums through Lee's escrow account.

[16] Mercury's argument that Arnold's knowledge is irrelevant because Lee assumed that Constable must have signed the application is a red herring. The issue is Mercury's imputed knowledge of the true facts regarding Lee's residence, not whether the misrepresentation can be attributed to Lee because it may have been signed by his agent, Constable.

are – we have an association with the Independent Agents of Georgia" Second, Arnold's contract with Mercury stated that he was an independent contractor rather than an employee. But, "[a]n independent contractor may also be an agent." (Citations and punctuation omitted.) *Nat. Home Life Assur. Co. v. Hawkins*, 151 Ga. App. 60 (258 SE2d 913) (1979).

"While an independent insurance agent or broker is normally considered the agent of the insured, it can also, depending on the specific facts of each case, be a dual agent for both the insurer and the insured." (Citations and punctuation omitted.) *Bowen Tree Surgeons v. Canal Indem. Co.*, 264 Ga. App. 520, 522 (591 SE2d 415) (2003). Based upon the evidence that Arnold had authority to bind Mercury, issues of fact exist with regard to dual agency. See id. (finding issues of fact on dual agency where agent "customarily accepted premiums and notices of premiums on [insurance company's] behalf"). Compare *Canal Ins. Co. v. Harrison*, 189 Ga. App. 681, 683 (1) (376 SE2d 923) (1988) (concluding that, among other things, there was a lack of evidence that insurance agent was dual agent of insurer where unequivocal testimony showed that the agent could *not* bind coverage for the insurer). See also *Sumitomo Marine & Fire Ins. Co. v. Southern Guar. Ins. Co.*, 337 FSupp.2d 1339, 1353 (N.D. Ga. 2004) (insurance agent also agent of insurer based upon evidence showing, in

31

part, that agent signed certificates of insurance as "authorized representative" and could bind coverage).

3. *Estoppel*. In another alternative argument, Lee contends that genuine issues of material fact exist with regard to whether Mercury is estopped from voiding the contract based upon the lengthy delay between when it learned of the misrepresentation and its denial of coverage. We agree.

If an insurer seeks to void a policy on the grounds of misrepresentation, it "must, upon discovery of the facts, at once announce [its] purpose and adhere to it. Otherwise, [it] cannot avoid or rescind such contract." (Citation and punctuation omitted.) *Lively*, supra, 256 Ga. App. 198 (2). "One significant reason for this rule in insurance cases is that leading the insured to believe the validity of the policy is not questioned lulls the insured into not purchasing other insurance and thus subjects the insured's property to continuing non-coverage." *Florida Intl. Indemn. Co. v. Osgood*, 233 Ga. App. 111, 113-114 (1) (503 SE2d 371) (1998).

The record shows that the fire occurred on May 5, 2012. On May 9, 2012, the Clayton County Fire Department closed its investigation into the cause of the fire based upon its opinion that it was accidental. On May 12, 2012, Lee gave a recorded statement to Mercury during a walk-through of the residence. In this recorded

statement, Lee disclosed that he was not present at the time of the fire because he was at his home in South Carolina. On June 5, 2012, Lee gave a second recorded statement to a different adjustor in which he also disclosed that he lived in South Carolina and stayed at the house when traveling for work in Georgia.

On June 15, 2012, counsel for Mercury advised Lee that it had been retained "to advise [Mercury] regarding its rights and obligations during its investigation" of the fire loss. Counsel requested that Lee "submit a signed, sworn proof of loss for the loss, which includes detailed information about the damages being claimed." On July 31, 2012, counsel for Mercury sent a letter to Lee acknowledging receipt of the proof of loss and stated that it was not being accepted or rejected "at this time, but rather is being held without action pending the completion of Mercury's investigation." It also confirmed that Mercury had requested an examination under oath. Lee provided an examination under oath on August 3, 2012, and confirmed once again that the home was a secondary residence.

On August 13, 2012, Mercury renewed Lee's policy on the property based upon a premium payment of $1,221. On September 7, October 12, and November 13, 2012, Mercury sent identical form letters to Lee stating that it would provide him "with its evaluation of the claim and the terms, exclusions, conditions and other

provisions of the policy that may apply to your claim once Mercury has completed its investigation." The record is silent as to what investigation remained to be completed at the time these letters were sent, and it does not show that Mercury asked for any additional information from Lee after his statement under oath on August 3, 2012. After receiving the form letters, Lee "felt compelled to seek the advice of and retain an attorney."

On December 2, 2012, Lee's attorney notified Mercury's counsel that he had been retained to advise Lee about his rights under the policy. He made a demand for payment within 60 days and stated, "Mr. Lee has made several attempts to reach a settlement with Mercury since the loss. . . . With each attempt at settlement, Mr. Lee has received the same generic response letter and has not received any substantial information about the status of his claim."

On December 6, 2012, a Mercury claims analyst sent Lee a letter informing him for the first time that it was voiding his policy based upon the material misrepresentation in his application that the insured location was his primary residence. Checks dated November 28, 2012, in the amount of premiums paid by Lee were included with the letter. Lee's expert opined in his affidavit that Mercury should have completed its investigation within 90 days from the date of the fire.

34

This evidence creates genuine issues of material fact as to whether Mercury is estopped from asserting that the policy was void. At best, Mercury knew all it needed to know about Lee's primary residence by the August 3, 2012 examination under oath, yet continued to send form letters to Lee regarding its outstanding investigation into matters unknown. At worst, it knew at the time of either his May 12th or June 5th recorded statement. But it did not notify Lee of its intent to void the policy until after it received a letter from his recently retained counsel demanding payment. Moreover, it renewed his policy *after* learning about alleged misrepresentations in the application. We therefore find that genuine issues of material fact exist on the issue of estoppel or waiver. See *American Safety Indem. Co. v. Sto Corp.*, 342 Ga. App. 263, 271-272 (4) (802 SE2d 448) (2017) (affirming grant of summary judgment to insured on insurer's counterclaim for rescission based upon unexplained six-month delay in notifying insured of intent to void policy); *Lively*, supra, 256 Ga. App. at 198-199 (reversing grant of summary judgment to insurer based upon genuine issues of material fact as to whether insurer waived defense that policy was void by failing to take such position until one year after learning of misrepresentations in application); *Thompson v. Permanent Gen. Assur. Corp.*, 238 Ga. App. 450, 451 (519

35

SE2d 249) (1999) (renewal of insurance policy evidence of waiver of grounds to void policy).

The dissent relies upon statutes and case law providing generally that an insurer should not be penalized for investigating a claim.[17] But the record before us does not show the nature of any continued investigation by Mercury after the August 3, 2012 examination under oath. The form letters asserting an unspecified investigation are insufficient to mandate summary judgment in Mercury's favor on the issue of estoppel in light of the other evidence that it was aware of all of the facts surrounding Lee's primary residence by the time of the examination under oath. We have previously concluded that an insurer's assertion that its actions were part of a necessary investigation to avoid possible bad faith liability is insufficient to warrant summary judgment in the insurance company's favor on the issue of estoppel. *Lively*, supra, 256 Ga. App. at 198-199 (2). Additionally, Mercury's renewal of the policy and failure to notify Lee of its intent to void the policy subjected his property to

---

[17] See OCGA § 33-24-40; *R&G Investments & Holdings v. American Family Ins. Co.*, 337 Ga. App. 588, 599 (4) (b) (787 SE2d 765) (2016) (holding investigation without proper reservation of rights did not result in waiver or estoppel; timing of knowledge of misrepresentation not discussed); *Brazil v. Govt. Employees Ins. Co.*, 199 Ga. App. 343, 344 (1) (404 SE2d 807) (1991) (holding insurer entitled to investigate before denying claim).

continuing non-coverage. See *Osgood*, supra, 233 Ga. App. at 115 (1) (retention of

premium and failure to announce policy is void communicates that policy is honored).

Accordingly, issues of fact exist with regard to detrimental reliance and estoppel.[18]

4. *Bad Faith*. Lee argues that the trial court erred in granting summary

judgment in favor of Mercury on the issue of bad faith. We disagree.

"Penalties for bad faith are not authorized where the insurance company has

any reasonable ground to contest the claim and where there is a disputed question of

fact." (Citation and punctuation omitted.) *American Safety Indem. Co.*, supra, 342 Ga.

App. at 273 (5). "Ordinarily, the question of bad faith is one for the jury. However,

when there is no evidence of unfounded reason for the nonpayment, *or* if the issue of

---

[18] The estoppel cases cited by the dissent do not mandate a different result as none of them involved the issue of whether an insurance company was estopped from asserting that a policy was void based upon a misrepresentation in an application. See *Robinson v. Boyd*, 288 Ga. 53 (701 SE2d 165) (2010) (deciding whether plaintiff estopped from pursuing action because it concealed filing of suit); *Capital City Developers v. Bank of North Ga.*, 316 Ga. App. 624 (730 SE2d 99) (2012) (addressing whether bank estopped from pursuing deficiency judgment); *Ga. Farm Bureau Mut. Ins. Co. v. Vanhuss*, 243 Ga. App. 26 (532 SE2d 135) (2000) (insurance company not estopped to seek declaratory judgment that it had no duty to defend based upon its earlier decision to defend underlying lawsuit; no detrimental reliance resulted from defense provided by insurer); *Allstate Ins. Co. v. Sapp*, 223 Ga. App. 443 (477 SE2d 869) (1996) (deciding that insurance company not estopped from denying coverage based upon statements by insured about existence of coverage in criminal case).

liability is close, the court should disallow imposition of bad faith penalties."

(Citation and punctuation omitted; emphasis in original.) Id. This rule applies even

if genuine issues of fact exist with regard to whether the insurer's conduct in denying

the claim, in part, may have been based upon bad faith. Id. at 274 (5), n. 13. See

*Auto-Owners Ins. Co. v. Neisler*, 334 Ga. App. 284, 290 (2) (779 SE2d 55) (2015)

(defense that shows "reasonable and probable cause for making it would vindicate the

good faith of the [insurance] company as effectually as would a complete defense to

the action") (citations omitted). As we cannot say that Mercury had *no* reasonable

grounds to contest Lee's claim, we affirm the trial court's grant of summary judgment

to Mercury and the denial of summary judgment to Lee on the issue of Mercury's bad

faith.

5. *Motion to Compel*. Lee contends that the trial court erred by denying his

motion to compel production of Mercury's claim file and communications with its

attorneys. We disagree.

A "trial court's discretion in dealing with discovery matters is very broad, and

this [C]ourt has stated on numerous occasions that it will not interfere with the

exercise of that discretion absent a clear abuse." *de Castro v. Durrell*, 295 Ga. App.

194, 204 (3) (671 SE2d 244) (2008). And our Supreme Court has held that

38

OCGA § 9-11-26 (b) (3) generally prohibits the compelled disclosure of materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" unless the party seeking their disclosure shows (1) that it has a "substantial need" for the materials to prepare its case and (2) that it is "unable without undue hardship to obtain the substantial equivalent of the materials by other means."

(Citation omitted.) *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C.*, 293 Ga. 419, 429 (2) (746 SE2d 98) (2013).

Lee asserts that the claim files and attorney-client communications are necessary to support his claim of bad faith based upon Mercury's delay in denying his claim and the thoroughness of its investigation.[19] For the reasons stated above, however, Mercury is entitled to summary judgment on Lee's bad faith claim. Accordingly, Lee no longer has the asserted need for the documents and we affirm the trial court's denial of his motion to compel.

6. *Motion to Strike.* In his remaining enumeration of error, Lee argues that the trial court erred by denying his motion to strike the affidavit of Mercury's director of underwriting, Kevin Bailey. The record shows that Lee moved to strike the affidavit,

---

[19] Lee does not assert on appeal that he is entitled to this information to support his claim that Mercury is estopped from voiding the policy.

in whole or in part, because it was "contradicted by his prior sworn testimony and is conclusory and without reference to any factual basis, but is submitted only in an attempt to contradict previous sworn testimony." The motion did not specify which portions of the affidavit Lee sought to strike. In the hearing on the motion for summary judgment, Lee's counsel clarified that he sought to strike the portion of Bailey's affidavit stating that Mercury would not have issued the policy had it known the true facts about Lee's primary residence. Based upon Bailey's deposition testimony that he was not personally involved in underwriting Lee's policy, Lee asserted that Bailey had "no personal knowledge or basis about any portion of the way the underwriting went." Lee also pointed out that Bailey offered no information to support his conclusion.

While Bailey offered no specific facts to support his conclusion that Mercury would not have issued the policy if it had known the true facts, he also averred that, as Mercury's director of underwriting, he was familiar with the company's policies and practices at the time Lee's application was issued and thus his responsibilities included determining whether a particular "application for insurance meets the company's guidelines for acceptance of a risk." As Bailey possessed the requisite knowledge to provide an opinion about whether Mercury would have issued the

40

policy, the trial court properly denied Lee's motion to strike Bailey's affidavit. See *T. J. Blake Trucking*, supra, 284 Ga. App. at 385 (1).

*Conclusion*

In sum, we reverse the trial court's grant of summary judgment in favor of Mercury Insurance with regard to all issues other than bad faith, grant Lee's motion for summary judgment on the issue of coverage under the policy, and affirm the trial court's denial of Lee's motion to strike and motion to compel.

*Judgment affirmed in part, reversed in part. Barnes, P. J., Miller, P. J., Ellington, P. J., Rickman, Mercier and Reese, J.J., concur. McFadden, P. J., and McMillian, J., concur specially in Division 1 and concur fully with Divisions 2, 3, 4, 5 and 6. Doyle, J. concurs fully with Divisions 2, 3, 4, 5 and 6 and in judgment only as to Division 1. Dillard, C. J., Ray, P. J., Andrews, Branch, and Bethel, J.J., concur in the judgment only as to Divisions 4, 5 and 6, and dissent to Divisions 1, 2 and 3.*

A17A0624. LEE v. MERCURY INSURANCE COMPANY OF
    GEORGIA.

McFADDEN, Presiding Judge, concurring fully in part and specially in part.

I agree that the policy language does not preclude coverage. But I reach that conclusion by a shorter route than the majority. So I concur specially in Division 1 of the majority opinion and fully in the remaining divisions.

The policy covers a "dwelling on the residence premises shown in the Declarations used principally as *a* private residence[.]" (Emphasis supplied.) The words "a . . . residence" encompass the property at issue here, even though Lee does not use the property as his primary residence. "A" is the indefinite article (as opposed to the definite article, "the"); "a" "refer[s] to a person or thing that is not identified or specified." https://www.merriam-webster.com/dictionary/indefinite%20article

(accessed Oct. 26, 2017). As for "residence," one "may have several residences, but only one place of domicile." *Avery v. Bower*, 170 Ga. 202, 204 (152 SE 239) (1930); *Kean v. Marshall*, 294 Ga. App. 459, 461 (1) (669 SE2d 463) (2008); *Baldwin v. State Farm Fire & Cas. Co.*, 264 Ga. App. 229, 230 (1) (590 SE2d 206) (2003) (citation and punctuation omitted). The property at issue here is shown on the Declaration page and there is evidence that Lee sometimes resided there. So the policy's use of the phrase "a . . . residence" does not entitle the insurer to deny coverage on the basis that the insured property was not Lee's domicile.

I also write separately because I disagree with the dissent's criticisms of Lee's brief. Whether his argument about this policy language is "threadbare" is, I suppose, a matter of opinion. I found his brief ably prepared and his argument on that issue sufficient.

But the dissent falls into serious error when it declares that Lee's enumeration of errors is legally insufficient. Lee enumerated as error the grant of the insurer's motion for summary judgment and the denial of his own motion for summary judgment. That is sufficient. Contrary to the dissent's assertion, an *argument* need not be enumerated as error.

In appellate practice, an error of law is "a false or mistaken conception or application of the law. Such a mistaken or false conception or application of the law to the facts of a cause as will furnish ground for a review of the proceedings." Black's Law Dictionary (5th ed.). An error of law has as its basis a specific ruling made by the trial court. . . . The individual facets of [Lee's] attack on the legal ruling with which [he] took issue are arguments in support of a legal position and are not, in and of themselves, errors of law. Because the arguments supporting a position concerning a legal ruling are not themselves legal rulings, they do not have to be enunciated in the enumeration of errors in order to merit appellate consideration. Such arguments, however, must be addressed by the appellate court if necessary to its decision on the issue of the propriety of the trial court's ruling.

*Felix v. State*, 271 Ga. 534, 539-540 (523 SE2d 1) (1999) (punctuation omitted).

I am authorized to state that Judge McMillian joins in this concurrence.

A17A0624. LEE v. MERCURY INSURANCE COMPANY OF
    GEORGIA et al.

DILLARD, Chief Judge, concurring in part and dissenting in part.

The majority's Herculean effort to manufacture ambiguity out of otherwise unexceptionable and plain policy language is perfectly understandable. Lee is a sympathetic party. He stepped up to help a dear friend during a difficult time, and for that, we commend him. But the policy says what it says, and no act of kindness can change that. Nevertheless, the majority has chosen to disregard the plain meaning of the policy and well-settled precedent in order to achieve a result to its liking—accomplishing this extraordinary feat with only a semicolon and an unsubstantiated and irrelevant deposition remark. In doing so, the majority has unnecessarily muddied the waters of our jurisprudence. Indeed, the dubious reasoning

employed by the majority to create an ambiguity out of whole cloth will undoubtedly be used by future (and perhaps less sympathetic) litigants to achieve similar results. And because I believe the majority's decision sets a dangerous precedent that will have ramifications far beyond the dispute before us, I respectfully dissent.

Specifically, I disagree with the majority's holding in Division 1 reversing the trial court's grant of summary judgment in favor of Mercury.[1] And for this same reason, I believe that it is unnecessary to address, as the majority does in Division 2, whether Lee made material misrepresentations on the insurance application, such that they voided the policy as contemplated by OCGA § 33-24-7 (b), or whether Arnold—the independent insurance agent who filled out the insurance application—was a dual agent, such that his knowledge of any misrepresentations was imputed to Mercury, and thus, bound the insurer.[2]

---

[1] I concur in judgment only to Division 4 of the majority opinion, which affirms the grant of summary judgment to Mercury on the issue of bad faith. I also concur in the judgment only as to Division 5, which affirms the trial court's denial of Lee's motion to compel discovery, and to Division 6, which affirms the trial court's denial of Lee's motion to strike the affidavit of Mercury's director of underwriting.

[2] See Banks v. Brotherhood Mut. Ins. Co., 301 Ga. App. 101, 104 (2) (686 SE2d 872) (2009) ("A grant of summary judgment must be affirmed if right for any reason. It is the grant itself that is to be reviewed for error, and not the analysis employed." (punctuation omitted)).

1. As an initial matter, Lee fails to specifically enumerate as error the trial court's grant of summary judgment on the ground that the policy language precludes coverage. And while Lee asserts that the property is covered under the policy within his specific enumeration that genuine issues of material fact remain as to whether he made material misrepresentations on the application, "a party cannot expand his enumerations of error through argument or citation in his brief."[3] Furthermore, Lee fails to support this bare assertion with any analysis or citation to authority.[4] And when confronted with Mercury's appellate brief, which specifically noted this lack of analysis, Lee's response was silence (as he filed no reply).[5] Consequently, Lee has

---

[3] *Smyrna Dev. Co. v. Whitener Ltd. P'ship*, 280 Ga. App. 788, 790 (1) (635 SE2d 173) (2006) (punctuation omitted); *accord Am. Mgmt. Servs. E., Inc. v. Fort Benning Family Communities, LLC*, 318 Ga. App. 827, 830 (2) (734 SE2d 833) (2012); *Cross v. Ivester*, 315 Ga. App. 760, 763 (1) n. 1 (728 SE2d 299) (2012).

[4] *See, e.g., Sirdah v. N. Springs Assocs., LLLP*, 304 Ga. App. 348, 352 (2) (696 SE2d 391) (2010) ("[M]ere conclusory statements are not the type of meaningful argument contemplated by [our rules]."). As the majority notes, Lee made a more detailed argument below that his loss was covered by the subject policy. Thus, his failure to do so on appeal is telling.

[5] *But see, e.g., Am. Strategic Ins. Corp. v. Helm*, 327 Ga. App. 482, 486 n.2 (759 SE2d 563) (2014) (noting that, to the extent appellant raised new arguments in a reply brief, those arguments had been waived and would not be considered).

abandoned any challenge to the trial court's grant of summary judgment in this regard.[6]

2. Nevertheless, even if I were inclined to forgivingly construe Lee's threadbare claim as argument, the trial court correctly found that the language in the Mercury policy precluded coverage. Insurance contracts are, of course, governed by "the rules of construction applicable to other contracts, and words in the policy must be given their usual and common signification and customary meaning."[7] It is similarly well established that the hallmark of contract construction is to ascertain the

---

[6] *See Estate of Nixon v. Barber*, 340 Ga. App. 103, 110 (2) (796 SE2d 489) (2017) (holding that appellant abandoned claim of error by failing to provide citation to authority in support of same); *Smyrna Dev. Co.*, 280 Ga. App. at 790 (1) (holding that appellant abandoned any argument that was not specifically enumerated as error, even though assertion that trial court erred with regard to subject of argument was buried within appellant's brief). *See generally* COURT OF APPEALS R. 25 (c) (2) ("Any enumeration of error which is not supported in the brief by citation of authority or argument may be deemed abandoned."). In support of its argument that Lee has not abandoned any claims, the majority cites my opinion in *Woods v. Hall*, 315 Ga. App. 93, 95-96 (726 SE2d 596) (2012), in which we exercised our discretion to review the appellant's claims despite his nearly complete failure to comply with this Court's rules. But what the majority fails to acknowledge is that, despite reviewing appellant's claims, we stated unequivocally that we were authorized to treat such claims as abandoned. *Id.* at 96. That we declined to do so in that instance was, not surprisingly, due to appellant's status as a *pro se* litigant. *Id.* at 95.

[7] *Roberson v. Leone*, 315 Ga. App. 459, 462 (726 SE2d 565) (2012) (punctuation omitted); *accord Turner v. Gateway Ins. Co.*, 290 Ga. App. 737, 739 (660 SE2d 484) (2008).

intention of the parties, as set out in the language of the policy.[8] And when the language of an insurance policy defining the extent of an insurer's liability is "unambiguous and capable of but one reasonable construction, the courts must expound the contract as made by the parties."[9] Importantly, the proper construction of a contract, and whether the contract is ambiguous, are "questions of law for the court to decide."[10]

In this matter, the completed application for the Mercury policy explicitly indicated that the property was Lee's primary residence and that the property was occupied by Lee, the named insured. The Declarations page of the policy lists the named insured as "Ronald W Lee[,] A Single Man" and identifies the property location as "7066 Dalmatia Drive in Riverdale, GA 30296." And on the first page of the policy, under the heading titled "Agreement," it states: "We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy. You agree that the policy has been issued in

---

[8] *See Roberson*, 315 Ga. App. at 462 (punctuation omitted); *accord Infinity Gen. Ins. Co. v. Litton*, 308 Ga. App. 497, 500 (707 SE2d 885) (2011).

[9] *Roberson*, 315 Ga. App. at 462 (punctuation omitted); *accord Litton*, 308 Ga. App. at 500.

[10] *Roberson*, 315 Ga. App. at 462 (punctuation omitted); *accord Clayton v. S. Gen. Ins. Co.*, 306 Ga. App. 394, 396 (702 SE2d 446) (2010).

reliance upon statements in the Declarations and the application." Turning to the "Definitions" section, the policy in part provides:

"Insured location" means:

(a) the residence premises;

(b) that part of any other premises, other structures and grounds, used by you as a residence and which is shown in the Declarations or a one or two family dwelling which is acquired by you during the policy period for your use as a residence and reported to us within thirty days of its acquisition.[11]

The policy further provides: "'Residence premises' means the one, two, three or four family dwelling, condominium or rental unit, other structures and grounds, used principally as a private residence; where you reside and which is shown in the Declarations." And under the "Coverage" section of the policy, it states: "We cover:

---

[11] In footnote 3 of its opinion, the majority notes that the definition for "Insured location" only comes into play in the portion of the policy providing "Coverage F - Medical Payments to Others" and is not implicated in determining coverage for a loss due to a fire. But while the term "Insured location" seems to only appear in the section noted by the majority, nothing in the policy explicitly anchors that term exclusively to Coverage F nor otherwise precludes it from being employed as part of construing the policy as a whole as our case authority demands. *See York Ins. Co. v. Williams Seafood Albany, Inc.*, 273 Ga. 710, 712 (544 SE2d 156) (2001); *accord Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 328 (498 SE2d 492) (1998); *McCann v. Glynn Lumber Co.*, 199 Ga. 669, 674 (34 SE2d 839) (1945).

the dwelling on the residence premises shown in the Declarations used principally as a private residence. . . ." Additionally, the word "reside" is commonly defined, *inter alia*, as "[t]o dwell permanently or for a considerable time, to have one's settled or usual abode, to live, in or at a particular place."[12]

Here, the application indicated that the property being insured was a "primary residence" and that Lee "occupied"[13] the property. The plain language of the Mercury policy insuring the subject property then provides that it covers the residence premises and defines such as a private residence where the insured resides. Thus, the policy required as a condition of coverage that the insured use the property as his private residence. But it is undisputed that although Lee would stay at the 7066 Dalmatia Drive house from time to time when traveling for work, he did not *reside* there according to a common—and indeed his own—understanding of that term, but

---

[12] THE COMPACT OXFORD ENGLISH DICTIONARY 1567 (2d ed. 1991); *see also* BLACK'S LAW DICTIONARY 1310 (9th ed. 2009) (defining "residence" as, *inter alia*, "[t]he act or fact of living in a given place for some time . . . The place where one actually lives, as distinguished from a domicile . . . means bodily presence as an inhabitant in a given place . . . Sometimes though, the two terms [residence and domicile] are used synonymously . . . A house or fixed abode; a dwelling . . . .").

[13] *See* THE COMPACT OXFORD ENGLISH DICTIONARY 1198 (2d ed. 1991) (defining "occupied" as, *inter alia*, "Taken possession of; held in possession, dwelt in . . . .").

7

rather, resided in South Carolina with his wife. In fact, in his deposition, Lee adamantly claims that he never intended to live at the home and that Arnold was aware that he would only be staying there when his travel schedule permitted. Lee nonetheless asserts that the subject property was covered by the policy because it did not define the term "primary residence." But this argument ignores the fact that our case authority has not required that this term be defined in a policy in order to determine (for coverage purposes) whether an insured "resides" at the property to be insured.[14]

---

[14] *See Varsalona v. Auto-Owners Ins. Co.*, 281 Ga. App. 644, 645-46 (637 SE2d 64) (2006) (holding that insurance policy, which unambiguously required as a condition of coverage that the insureds use the residence premises principally as their private residence, provided no coverage for property damage to the insured residence because insureds never used the insured property as their residence); *Epps v. Nicholson*, 187 Ga. App. 246, 246-47 (1) (370 SE2d 13) (1988) (holding that fire-insurance policy had two requirements for coverage: (1) dwelling must be place wherein insured resided, and (2) dwelling must be shown as residential premises in declarations; therefore, insured's failure to reside in home covered under residential fire insurance policy precluded coverage). *Cf. Hill v. Nationwide Mut. Fire Ins. Co.*, 214 Ga. App. 715, 717-18 (448 SE2d 747) (1994) (holding that language in insurance policy did not require insured to live at premises in order for dwelling to be covered because unlike the policy in *Epps*, which when defining "residence premises" included the word "and" between "where you reside" and "which is shown . . . [on the declaration page]," and thus required the insured to live on the property, the conjunctive "and" does not appear in the policy at issue, but, in contrast, the disjunctive "or" does); *Ga. Int'l Life Ins. Co. v. Bear's Den, Inc.*, 162 Ga. App. 833, 834-35 (1) (292 SE2d 502) (1982) (holding that language providing for two separate means to determine when insurance policy became enforceable, which contained no

8

Nevertheless, the majority argues that whether the policy language required Lee to reside at the home as a condition for coverage is at best ambiguous. And faced with the policy's plain language belying this contention, the majority conscripts the semicolon separating the term "private residence" and "where you reside" in the definition of "residence premises," and assigns it the disjunctive properties of the word "or." So tasked, the majority then asserts that the semicolon's placement could allow a layperson to understand "residence premises" to mean "the one, two, three or four family dwelling, condominium or rental unit, other structures and grounds, used principally as a private residence" *or* "where you reside and which is shown in the Declarations." Finally, the majority maintains that my reading of the "residence premises" definition, conjunctively rather than disjunctively, rewrites the policy by removing the semicolon.

In considering the majority's argument, I begin by acknowledging that, in some situations, "[p]unctuation is an important indicator of meaning."[15] That said, the Supreme Court of the United States has rightly noted that it "will first take the

---

conjunctive or disjunctive terms, was to be read disjunctively when either of the means permitted under Georgia case law).

[15] *Hill*, 214 Ga. App. at 717 (punctuation omitted).

9

instrument by its four corners, in order to ascertain its true meaning; if that is apparent, on judicially inspecting the whole, the punctuation will not be suffered to change it."[16] Similarly, this Court has held that "[t]he punctuation of an instrument may be considered when the meaning is doubtful, but it cannot control if the meaning otherwise plainly appears."[17] Indeed, punctuation is "always subordinate to the text, and is never allowed to control its meaning."[18] Put simply, "the words control the punctuation marks, and not the punctuation marks the words."[19]

Here, the majority argues that the placement of the semicolon *creates* ambiguity in the "residence premises" definition, thus burdening that punctuation

---

[16] *Ewing's Lessee v. Burnet*, 36 U.S. 41, 54 (11 Pet. 41, 9 LEd 624) (1837). The majority makes much of the criticism leveled against *Burnet* in READING LAW: THE INTERPRETATION OF LEGAL TEXTS by Antonin Scalia and Bryan Garner (1st ed 2012). *See* Scalia & Garner, *supra*, at 162. While it is perhaps true that some of the language contained in *Burnet* is unnecessarily restrictive or "anachronistic" in describing when punctuation can or should be used by courts to help ascertain the meaning of a law or instrument, the admonition by the Supreme Court of the United States against elevating punctuation over language to create ambiguity when there is none remains just as forceful now as it was in 1837. And nothing in *Reading Law* suggests otherwise.

[17] *Bridges v. Home Guano Co.*, 33 Ga. App. 305, 311 (125 SE 872) (1924) (punctuation omitted).

[18] *Id.* (punctuation omitted).

[19] *Id.* (punctuation omitted).

mark with a laboring oar that, under our case law and common use, it was never meant to carry. Moreover, following the majority's grammatical logic to its necessary conclusion, if one construes the definition of residence premises disjunctively, the subject policy would provide coverage for "the one, two, three or four family dwelling, condominium or rental unit, other structures and grounds, used principally as a private residence" *without* any requirement that such dwelling be "shown in the Declarations." Suffice it to say, such a tortured reading would then put this definition at odds with the "Coverage" section of the policy, which as previously noted provides that Mercury covers "the dwelling on the residence premises *shown in the Declarations* used principally as a private residence. . . ." This would then run afoul of our well-established principle that "[i]n construing an insurance contract, a court must consider it as a whole, give effect to each provision, and interpret each provision to harmonize with each other."[20] And the majority opinion runs further afoul of this

_____

[20] *York Ins. Co.*, 273 Ga. at 712; *accord R&G Inv. & Holdings, LLC v. Am. Family Ins. Co.*, 337 Ga. App. 588, 592 (2) (787 SE2d 765) (2016); *see Royal v. Ga. Farm Bureau Mut. Ins. Co.*, 333 Ga. App. 881, 882 (777 SE2d 713) (2015) ("In construing an insurance policy, we begin, as with any contract, with the text of the contract itself. One of the most well-established rules of contract construction is that the contract must be construed as a whole, and the whole contract should be looked to in arriving at the construction of any part." (punctuation omitted)). As additional support for its interpretation of the policy, the majority cites to deposition testimony provided by Mercury's director of underwriting, in which he states that Mercury

11

principle when it ignores the language in the application indicating that the property was being insured as a "primary residence" that Lee occupied, as well as the first lines of the policy itself, which provide that it was issued in reliance on that application and the declarations. Indeed, when an application for insurance is "attached to or made a part of an insurance contract by reference, the contract must be construed

---

"use[s] the same policy contract for primary or secondary dwelling." The majority's reliance on this testimony is misplaced. Even if the director's assertion is correct, it fails to account for the entirety of the policy, which would necessarily include the declarations page and the application. Consequently, the majority's contention that our reading of the policy is such that a beach, mountain home, or other secondary dwelling would never be covered under a Mercury insurance policy is baseless. Moreover, and importantly, the director was not asked specific coverage questions during his deposition, leaving one to wonder how he would have responded if asked more pointedly whether the policy would cover property not listed in the declarations page, as the majority's construction would allow. Furthermore, nothing else in the record remotely supports the director's remark, and it is curious that the majority finds the director's statement in this context so convincing yet puts so little credence in the same director's averment as to whether the application contained a material misrepresentation. Regardless, when, as here, the terms of the contract are clear and unambiguous, "the court looks only to the contract to find the parties' intent." *Quality Foods, Inc. v. Smithberg*, 288 Ga. App. 47, 51 (1) (653 SE2d 486) (2007). And it is well settled that parol evidence is inadmissible to "add to, take from, vary or contradict the terms of a written instrument." *Preferred Risk Mut. Ins. Co. v. Jones*, 233 Ga. 423, 424 (1) (211 S.E.2d 720) (1975); *accord* OCGA § 13-2-2 (1); *In re Estate of Belcher*, 299 Ga.App. 432, 436 (1) (a) (682 SE2d 581) (2009). Moreover, "[w]hile parol evidence as to a party's understanding of the contract is admissible to explain ambiguities and to aid in the construction of contracts, it is not admissible to contradict or construe an unambiguous contract." *Willesen v. Ernest Commc'ns, Inc.*, 323 Ga. App. 457, 464 (3) (746 SE2d 755) (2013) (punctuation omitted). I maintain there is no such ambiguity here.

according to the terms contained therein as amplified, extended or modified by the application."[21]

Moreover, even if I were inclined to assign the semicolon the level of import the majority claims it deserves, I disagree that it supports the result the majority reaches. As *The Chicago Manual of Style* explains, "[i]n regular prose, a semicolon is most commonly used between two independent clauses not joined by a conjunction to signal a *closer connection* between them than a period would."[22] This description of the semicolon's most common use is echoed by *Garner's Modern American Usage*, which describes the semicolon as "a kind of supercomma" that "separates

---

[21] *West v. Rudd*, 242 Ga. 393, 396 (3) (249 SE2d 76) (1978); *accord Canal Indem. Co. v. E.M.C. Motors, Inc.*, 227 Ga. App. 84, 85 (1) (488 SE2d 126) (1997); *see* OCGA § 33-24-16 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application made a part of the policy." (punctuation omitted)). I recognize that the bulk of the majority's opinion focuses on whether the application's designation as a primary residence constituted a material misrepresentation. But this issue is separate and distinct from the coverage issue, which necessarily requires us to construe the insurance policy as a whole (including the language contained in the application). Furthermore, while Lee testified that he never read the Mercury application or, for that matter, the policy itself, "[a]s a general rule, an insured has a duty to read and examine an insurance policy to determine whether the coverage requested was procured." *Traina Enter., Inc. v. Cord & Wilburn, Inc. Ins. Agency*, 289 Ga. App. 833, 837 (2) (658 SE2d 460) (2008).

[22] THE CHICAGO MANUAL OF STYLE § 6.56, p. 389 (17th ed. 2017).

13

sentence parts that need a more distinct break than a comma can signal, but that are *too closely connected to be made into separate sentences . . . .*"[23] And these descriptions of the semicolon's most common use do not appear to be in conflict with the description offered by the majority—"[t]he semicolon is normally employed in marking off a series of sentences or clauses of coordinate value, that is, to separate consecutive phrases or clauses which are independent of each other grammatically, but dependent alike on some word preceding or following."[24] It is simply baffling that the majority believes this language somehow justifies the insertion of an "or" in the definition of "residence premises" or disjunctive treatment of the independent clauses at issue. Given these particular circumstances, I find the majority's construction of the "Residence premises" definition entirely unpersuasive. Accordingly, the trial court correctly concluded that the policy did not provide Lee with coverage and that Mercury was entitled to summary judgment on that ground.

3. Lee further contends that the trial court erred in granting summary judgment because genuine issues of material fact remain as to whether Mercury was estopped

---

[23] Bryan A. Garner, GARNER'S MODERN AMERICAN USAGE 659 (2d ed. 2003) (emphasis supplied).

[24] *Springtime, Inc. v. Douglas*, 228 Ga. 753, 755 (1) (187 SE2d 874) (1972).

from voiding the contract based on the lengthy delay between when it learned of the misrepresentation in the application and when it denied coverage. But to the extent Lee's contention here can be construed as an argument that Mercury is estopped from asserting that the language in its policy precluded coverage, this contention likewise lacks merit.

Under Georgia law, even without disclaiming liability and giving notice of its reservation of rights, "any insurer who merely proceeds to investigate a claim with knowledge of facts which might otherwise constitute a defense to coverage is not estopped from thereafter setting up the defense."[25] Indeed, OCGA § 33-24-40 provides that investigating any loss or claim under any policy shall not be deemed to constitute a waiver of any provision of a policy or of any defense of the insurer under the policy.[26] Thus, under the statute, Mercury's investigation of Lee's claim, in and

---

[25] *R&G Inv. & Holdings*, 337 Ga. App. at 599 (4) (b) (punctuation omitted).

[26] *See* OCGA § 33-24-40 (3) ("Without limitation of any right or defense of an insurer otherwise, none of the following acts by or on behalf of an insurer shall be deemed to constitute a waiver of any provision of a policy or of any defense of the insurer under the policy: . . . [i]nvestigating any loss or claim under any policy[.]").

of itself, cannot support Lee's contention that the insurer waived or is estopped from asserting any defense.[27]

Furthermore, for estoppel to arise, there "must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury."[28] Here, although Lee argues that Mercury's seven-month investigation of his claim was merely subterfuge intended to prevent him from filing a lawsuit until such an action was time-barred, he offers only speculation in support of this assertion. And more importantly, even if we were to assume that Mercury's investigation was a dilatory tactic, Lee has failed to even allege how he was injured, given that he, in

---

[27] *See R&G Inv. & Holdings, LLC*, 337 Ga. App. at 598-99 (4) (b) (holding that property insurer's investigation of vandalism claim without proper reservation of rights did not result in waiver or estoppel precluding insurer from raising any potential defenses to claim, including any defenses based on insured's failure to cooperate); *Brazil v. Gov't Emp. Ins. Co.*, 199 Ga. App. 343, 344 (1) (404 SE2d 807) (1991) (noting that pursuant to OCGA § 33-24-40, evidence of a delay in asserting a defense pending a full and complete investigation of insured's claim would not be material to the issue of whether insurer waived its defense).

[28] *Capital City Developers, LLC v. Bank of N. Ga.*, 316 Ga. App. 624, 628-29 (2) (730 SE2d 99) (2012) (punctuation omitted); *see Robinson v. Boyd*, 288 Ga. 53, 58 (4) (701 SE2d 165) (2010) (holding that "estoppel requires an act on the part of the one intended to influence the other, and detrimental reliance upon that act by the other" (punctuation omitted)); *see also* OCGA § 24-14-29.

16

fact, filed a timely lawsuit to enforce payment on his claim. Given these particular circumstances, Lee's argument that Mercury is estopped from voiding the policy lacks merit.[29]

Nevertheless, the majority argues that given the delay in denying Lee's claim and Lee's expert's testimony that such a delay was inordinate, genuine issues of material fact exist as to whether Mercury is estopped from voiding the policy and cites several cases that it claims supports this position. But these cases are inapposite. In *American Safety Indemnity Company v. Sto Corp.*,[30] we held that the insurer waived its defense that material misrepresentations in applications entitled it to rescind policies, when it failed to announce its intent to rescind the policies after learning of the alleged misrepresentations, but chose to issue a denial of coverage and continued to treat the policies as if they remained in force with respect to other

---

[29] *See Ga. Farm Bureau Mut. Ins. Co. v. Vanhuss*, 243 Ga. App. 26, 27 (532 SE2d 135) (2000) (holding that insurer's initial representation that the insured was covered and its initial agreement to defend him did not estop it from later denying coverage given that the insured did not detrimentally rely on the decision to defend the suits); *Allstate Ins. Co. v. Sapp*, 223 Ga. App. 443, 445 (477 SE2d 869) (1996) (holding that insured's failure to show justifiable reliance or a detrimental change in position precluded his claim that automobile insurer was estopped from denying coverage).

[30] 342 Ga. App. 263 (802 SE2d 448) (2017).

claims.[31] Similarly, in *Lively v. Southern Heritage Insurance Company*,[32] we held that summary judgment was not warranted because fact issues remained as to whether the insurer waived its defense that the policy was void based on material misrepresentations in the application when it failed to assert such defense until after the insured filed a lawsuit and never returned the insured's premiums.[33] Furthermore, none of the cases cited by the majority even mention OCGA § 33-24-40, much less discuss the statute's implications. Accordingly, the trial court did not err in finding that no genuine issue of material fact existed as to whether Mercury's lengthy investigation of Lee's claim estopped it from voiding the homeowner's insurance policy.[34]

4. Lee further argues that the trial court also erred in denying his cross-motion for summary judgment. But given that the trial court correctly granted summary

---

[31] *See id.* 342 Ga. App. 263 (802 SE2d at 455-56 (4)).

[32] 256 Ga. App. 195 (568 SE2d 98) (2002).

[33] *See id.* at 198-99 (2); *Thompson v. Permanent Gen. Assur. Corp.*, 238 Ga. App. 450, 452 (519 SE2d 249) (1999) (holding that upon learning of a misrepresentation in insurance application, insurer waives defense that misrepresentation voided the policy if it treats the policy as valid and binding and retains insured's premiums as earned).

[34] *See supra* notes 26 and 27.

judgment in Mercury's favor on the ground that the policy at issue precluded coverage for the subject property, this argument—and the majority's agreement with it—is without merit.

For all these reasons, I would affirm the trial court's grant of summary judgment in favor of Mercury.

I am authorized to state that Presiding Judge Ray and Judges Andrews, Branch, and Bethel join this dissent.